**J & D MAINTENANCE AND SERVICES, Plaintiff,**

v.

**UNITED STATES of America, Defendant,**

and

**S.D. Ashe Landscaping and Services, Inc., Intervenor.**

**No. 99–484C.**

United States Court of Federal Claims.

Dec. 28, 1999.

Michael A. Gordon, Holmes, Schwartz & Gordon, Rockville, MD, for intervenor.

## *OPINION*

BASKIR, Judge.

*An Introductory Note on Protected Information*

This protest has been litigated under a Protective Order entered on August 9, 1999. Rather than issue two opinions, one complete but sealed, and a redacted public version, the Court expressed its intention to file a single published opinion which would sufficiently inform the reader of the issues and their resolution, while still affording the parties the necessary confidentiality. The Court informed the parties by Order of November 23, 1999, of the types of information previously designated as sensitive which it proposed to include. The parties agreed that certain of this material did not require continued protection.

However, the government and Ashe sought continued protection for certain aspects of Ashe's bid structure. The Court has acceded to this request. Accordingly, the Court has substituted generic terms for specific references to this protected information. The generic terms appear in brackets and include a citation to the administrative record where the specifics may be found. Unless otherwise noted, all citations are to the administrative record filed by the government on August 5, 1999—the record in existence at the time the GAO made its decision to affirm the award of the contract to Ashe.

*Summary*

J & D Maintenance and Services has brought a post-award protest to the March 1, 1999, award of a grounds maintenance contract by the Naval Facilities Engineering Command to S.D. Ashe Landscaping & Services, Inc. J & D has moved for summary judgment, contending Ashe's bids were impermissibly unbalanced. We deny its motion and grant Ashe's and the government's cross motions.

Mahlon Fred McLean, McManus & McLean, L.L.P., Atlanta, GA, for plaintiff.

Russell A. Shultis, Department of Justice, Washington, D.C., Richard G. Welsh, Naval Facilities Command, Washington, D.C., and Tom A. Kathe, Navy Public Works Center, Jacksonville, FL, for defendant.

## The Procurement

J & D's central challenge to the Navy's award is an assertion that Ashe's bid was unbalanced and should have been rejected. We begin our consideration by reviewing the history of the solicitation and award with particular attention to the Navy's review of Ashe's bid.

The Navy issued the RFP on July 21, 1998. The awardee was to provide grounds maintenance services at three Naval bases in Florida. The contract had a base period and four one year options. J & D was the incumbent contractor.

Section M of Part IV of the amended solicitation provided for a best value selection based on price and technical factors. Price was as important as the cumulative importance of the technical factors. The determination of actual or total price was based upon overall pricing for the basic requirement and options.

By September 17, 1998, proposals were received from ten firms, including J & D and Ashe. There were no protests to the RFP terms. More significantly, there never was any challenge to the Navy's "indefinite quantity" (IQ) estimates, which were also for grounds maintenance. The technical proposals, such as methods and procedures, experience, past performance and corporate resources and management, were reviewed by the Technical Evaluation Board (TEB), which assigned adjectival ratings. The TEB initially rated the J & D and Ashe proposals "Highly Satisfactory," and included them in the competitive range. The Price Evaluation Board (PEB) evaluated price, and ranked the bidders based on overall evaluated price. In October the TEB and PEB provided recommendations to the Source Selection Board (SSB) which then provided a recommended best value to the Source Selection Authority ("SSA"). The combined rankings of the TEB and PEB had J & D as first, Ashe as second.

Written discussions took place with J & D and Ashe. The Navy specifically focused on whether Ashe's bid was unbalanced. It asked if the [FFP included inappropriate costs]. Ashe explained [its pricing strategy].

AR 0688, 0709, 1367. It denied its bid was unbalanced.

The AR contains two anomalies which later figure in J & D's claims. In one, an addendum attached to a subsequent January 1999 Post Negotiation Business Clearance Report stated that in this period the TEB had found Ashe's pricing structure "unacceptable!!" However, in the TEB's re-evaluation, issued on or about November 16, 1998, the word and punctuation "unacceptable!!" do not appear.

A second round of discussions was conducted and responses were received in November and December 1998. The TEB lowered Ashe's overall technical rating from Highly Satisfactory to Acceptable based on Ashe's inclusion of [particular costs] in its FFP line item prices. AR 1274. The TEB noted its concern regarding this aspect of Ashe's pricing structure, yet again ranked J & D first and Ashe second. The PEB ranked Ashe second, J & D third. The TEB's final combined ranking, as reflected in the Post–Negotiation Clearance Report, was J & D first, Ashe third.

J & D submitted its final proposal revision on December 30, 1998; Ashe on January 2, 1999. There were no changes to either technical proposal. The SSB met on January 13, 1999, to consider the TEB and PEB reports. The SSB came to three conclusions: First, that J & D's higher price was not justified; second, that [an advantage of Ashe's bid] did justify its FFP price; and finally, Ashe's [bid strategy] was acceptable business practice.

An SSB Post–Negotiation Business Clearance Report was also apparently drafted on and dated January 13, 1999. However, from the chairman of the SSB's declaration it would seem the Report was not actually signed until February 25, 1999. J & D cites this anomaly as the second defect in the AR.

The SSA and the SSB met on either February 25th or 28th, 1999. The SSA reviewed the TEB's ratings and determined that the downgrading of Ashe's overall technical rating was unwarranted. The SSA further determined that Ashe's proposal, which should have been rated Highly Satisfactory and which was lower in price than J & D's,

represented the best value to the government. At some point thereafter the SSB added an addendum to its report finding J & D and Ashe's proposals technically equivalent, rejecting the TEB's downgrading of Ashe's proposal to Acceptable, and elevating Ashe's rating to Highly Satisfactory. The SSA agreed and on March 1, 1999, approved the award to Ashe for the basic requirement amount of $1,873,235.04.

On March 11, 1999, J & D filed a protest with the Government Accounting Office ("GAO"). J & D argued that Ashe's proposal should have been rejected as unacceptable, arguing that Ashe failed to demonstrate understanding of, and ability to perform the work effort required; that Ashe failed to address adequately the employee qualifications subfactor; that Ashe failed to submit an adequately detailed workplan for the indefinite quantity work; that Ashe's description of its purchasing system was inadequate; and that Ashe did not submit a quality control plan. For purposes of J & D's challenge before this Court, J & D also argued that Ashe deviated from the terms of the solicitation by submitting an unbalanced offer. J & D did not challenge the agency's IQ estimates. The GAO denied J & D's protest in its entirety on June 18, 1999.

J & D then sought reconsideration, at this stage apparently adding to its position a challenge to the estimates the Navy used in its solicitation for IQ options. The relevance and validity of these estimates become significant during our discussion of J & D's theories.

On July 26, 1999 the GAO denied the petition for reconsideration, and that same day J & D filed its Complaint here. It should be noted that it is the GAO's regular practice to stay an award during the pendency of a protest. Thus, J & D remained on the premises operating under contract extensions from the end of its normal contract termination date until at least July 28, 1999. Ashe estimates that the contract is worth $240,000 per month, so the very fact that J & D filed its protest perhaps resulted in more than $1 million additional revenues.

These considerations were brought out at the first status conference when J & D was denied temporary injunctive relief. Thereafter J & D made a motion to conduct limited discovery, but we denied the motion as failing to meet the required showing. The parties then brought their dispositive motions and the Court held oral arguments on these motions on November 9, 1999.

### Legal Standard

■ In post-award bid protests brought pursuant to the 1996 revisions to the United States Court of Federal Claims Tucker Act jurisdiction, we must apply the standard of review for agency action established by the Administrative Procedure Act, § 5 U.S.C. 706 (1994). See § 28 U.S.C. 1491(b)(4). An agency procurement decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 5 U.S.C. 706(2)(A). This standard is a deferential one. The Court's role is limited to ensuring that the agency has examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. This inquiry is to be "searching and careful." *Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ As a general matter, the scope of review is confined to the administrative record, i.e., to the record before the decision maker when the final award decision was made. See *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). J & D complains of the artificial nature of the record, a point well taken. Unlike a formal adjudicatory proceeding, the record of a procurement has no defined content and is an artificial construct. In the first instance, certainly it contains what the government decides it should contain.

■ Upon a showing of necessity, the administrative record can be supplemented by discovery. *Esch v. Yeutter*, 876 F.2d 976 (D.C.Cir.1989); *Pikes Peak Family Housing v. United States*, 40 Fed.Cl. 673 (1998). Furthermore, the failure of a protester to take discovery or raise questions of fact before the GAO does not generally preclude it from doing so before us. *Cubic Applications, Inc.*

*v. United States,* 37 Fed.Cl. 339, 342 (1997). Although J & D sought discovery, it failed to make a case for it. Thus, we consider these motions solely on the administrative record as supplemented at the GAO level.

■ Absent evidence to the contrary, the court presumes the regularity of government action. See *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976) (holding that government officials are presumed to act in good faith). To rebut this presumption, a plaintiff must present "well-nigh [undeniable] proof" that the government acted in bad faith. *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 771 (1982).

■ Not every error requires rejection of the agency's action. See *SMS Data Prods. Group, Inc. v. United States,* 900 F.2d 1553, 1557 (Fed.Cir.1990); *Excavation Constr., Inc. v. United States,* 204 Ct.Cl. 299, 494 F.2d 1289, 1293 (1974). The court will not overturn a contract award based on de minimis errors made during the procurement process. See *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("overturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations").

■ There is a split in authority as to the burden of proof with regard to injunctive relief. However, a protester must demonstrate the existence of prejudicial error by at least a preponderance of the evidence. *Analytical & Research Tech. v. United States,* 39 Fed.Cl. 34, 55 (1997); *but see Durable Metals Prods. v. United States,* 27 Fed.Cl. 472, 479 (1993) (requiring protestor to show clear and convincing evidence).

All of the parties apparently agreed and re-affirmed at the oral argument that summary judgment is appropriate for resolution of the issues. RCFC 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Still, even where there are cross-motions, the Court must satisfy itself that there are no material facts in dispute. J & D points to two anomalies in the record which we have already mentioned. We will address them in more detail present-

ly. Nonetheless, these defects in the record do not constitute a bar to our resolution of the motions. *Tunnell v. Wiley,* 514 F.2d 971, 976 (3d Cir.1975); *Fort Myer Construction Corp. v. United States,* 42 Fed.Cl. 720 (1999). Therefore, we find that the record is ripe for summary judgment.

### Discussion

■ The thrust of J & D's protest is a challenge to the structure of Ashe's bid. The solicitation contemplated the award of a contract combining definite-quantity line items and indefinite quantity line items for a base year and up to four 1–year option periods. The definite quantity line items are referred to in the record as FFP. The FFP line items covered scheduled services, and the indefinite quantity items, for which estimates were provided, covered unscheduled services. J & D asserts that Ashe improperly included [particular costs] within the FFP prices, and that the Navy nonetheless improperly awarded Ashe the contract. J & D has phrased this argument in a number of different ways. We will first address the underlying argument, then each of the thematic variations.

### Basic Argument

J & D asserts that Ashe's inclusion of [particular] costs in the FFP line item prices was a deviation from the solicitation and an unbalanced offer which gave a competitive advantage over other offerors. See, Plaintiff's Motion For Summary Judgment, page 4, paragraph 6. The Court disagrees. There is a fundamental difference between unbalanced bids in sealed bid RFPs, and those in best value RFPs. In advertised or sealed bid procurements, the lowest priced responsive bidder receives the award. In such procurements, a mathematically unbalanced bid creates doubt as to price, which makes the bid non-responsive. 48 C.F.R. § 15.814.

In contrast, in a "best value" procurement, such as here, the agency considers other factors in addition to price in making award and a different FAR provision governs. A mathematical imbalance was not enough here to cause the bid to be rejected. 48 C.F.R. § 15.404. Rather, we find that the FAR and RFP only prohibit *materially* unbalanced

bids, and that Ashe's bid would only be materially unbalanced if it posed an unacceptable risk to the government, which it does not.

FAR § 15.404–1(g) states:

(1) Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract items is *significantly over or understated* as indicated by the application of cost or price analysis techniques....

    *     *     *     *     *     *

(2) ... If cost or price analysis techniques indicate that an offer is unbalanced, the contracting officer shall—

(i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and

(ii) Consider whether award of the contract will result in paying *unreasonably high prices for* contract performance.

(3) An offer *may* be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government. (Emphasis added).

Section L of the solicitation likewise provides that a proposal containing "materially" unbalanced prices "may be rejected" if the lack of balance poses an unacceptable risk to the government.

Ashe structured its bid so that the FFP included [certain costs]. AR 0688, 0709, 1367. As a result [of Ashe's bid structure], the TEB downgraded Ashe from its initial ranking of Highly Satisfactory to lower rank of Acceptable.

The SSB and SSA subsequently found that this downgrading was incorrect because it was based on an unstated evaluation criterion that did not exist in the RFP. On the contrary, Ashe's price structure actually provided certain benefits to the government. Therefore, Ashe deserved a Highly Satisfactory rating and its bid was the best value. AR 1681; AR 1467. The structure of Ashe's bid would only pose an unacceptable risk if its true price made it far from the best value. *Anderson Columbia Environmental v. United States,* 43 Fed.Cl. 693, 699 (1999). The Navy explicitly concluded that Ashe's offer was not unreasonably priced and did not pose an unacceptable risk of performance. As the Source Selection Board stated in its evaluation of Ashe, "A review of the pricing does not reveal any errors or inadequate prices as compared to the Government Estimate." The Board also stated [that it considered Ashe's pricing and bid strategy] "an acceptable business practice." AR 1466.

Since the bid was not materially unbalanced, it conformed to the solicitation and the government was not arbitrary, capricious, or acting in bad faith, when it accepted the bid. *Red River Service Corp.,* B–282634.2, 1999 WL 644445 (July 15, 1999). In *Red Rivers* the PEB was concerned with various aspects of the awardee's price proposal, including its overall low price, low prices for the indefinite-quantity work, and high prices for some other items. In response to the agency's expressed concerns, the awardee explained that its pricing was based on its own competitive pricing strategy, and its many years of experience performing housing maintenance contracts. The Navy was satisfied, based on the awardee's response, that the rationale behind its pricing was sound, and that it was aware of the risks involved in its strategy. The Comptroller General (CG) therefore found that the award, based on a proposal which included unbalanced pricing, was nonetheless proper. The CG made its ruling based on the agency's determination that the unbalancing did not pose unacceptable risk to government and would not result in government paying unreasonably high prices.

In this regard we note the decision of the GAO in our case:

Even if this pricing is viewed as unbalanced, however, the agency was not required to reject the offer on that basis. The RFP did not state that a proposal containing unbalanced prices between line items or subline items could be considered unacceptable, as the protester alleges; instead, it provided that a proposal containing materially unbalanced prices or prices whose lack of balance posed an unacceptable risk to the government could be considered unacceptable. RFP § L.3(f)(8). *CF.* Federal Acquisition Regulation § 15.404–

1(g)(3) (similar provision). Here, where the agency did not find that any lack of balance in Ashe's offer was material or created an unacceptable risk to the government, we will review that conclusion for reasonableness.

We see no basis to question the reasonableness of the agency's analysis here.... the protester does not challenge the accuracy of the quantity estimates, and there is no basis otherwise to doubt their accuracy, so any risk to the government should be limited and any unbalancing thus appears immaterial.

We note in this regard that while not bound by decisions of the GAO, we have historically afforded deference to them. *E.W. Bliss Co. v. United States*, 33 Fed.Cl. 123, 134–35 (1995), *aff'd* 77 F.3d 445 (Fed. Cir.1996). Deference or no, in this case we find our thinking in accord.

A mathematically unbalanced bid is not material if the solicitation's estimates are accurate. The lack of balance will only become less advantageous than it appears if the government ultimately orders a lesser quantity of the underpriced items. *Anderson Columbia*, 43 Fed.Cl. at 699 and 701. J & D agrees, but argues that Ashe's true price would be far from the best value if the government does not order the indefinite quantity services it has estimated will be needed. However, J & D did not and has not challenged or otherwise done anything before this Court to undermine the reasonableness of the government's indefinite quantity estimate.

J & D also argues that the fact that the Navy did not assess the likelihood that it would order less than its indefinite quantity estimate is a material failing. J & D has not cited any authority to support this contention, and we do not find it otherwise compelling. The RFP states that bids will be evaluated in accordance with the Navy estimates. Section M of Part IV of the solicitation states: "[T]he Government will evaluate offers for award purposes by adding the total price for all option to the total price for the basic requirements." Thus J & D's argument is rebutted by the RFP unless the estimates are somehow deficient. Since J &

D did not challenged the Navy's estimates before this Court, we see no reason to question the Navy's reliance on them unless their provenance is suspect. *Aerolease Long Beach v. United States*, 31 Fed.Cl. 342, 358 (1994) *aff'd* 39 F.3d 1198 (Fed.Cir.1994).

The Navy based the estimates on the information available to it, including its past experience when J & D held the contract. AR 0962. An estimate, based on past experience certainly is reasonable. The Navy had no subsequent reason to doubt this estimate, nor do we in the absence of a factual challenge by J & D. The regulatory language supports this analysis—

FAR § 15.404 addresses "proposal analysis." 15.404–1(c), which addresses "cost analysis," states:

(2) ... Such techniques and procedures [for cost analysis] include the following:

(i) Verification of cost or pricing data and evaluation of cost elements, including—

\* \* \* \* \* \*

(C) Reasonableness of estimates generated by appropriately calibrated and validated parametric models or cost-estimating relationships ....

In concluding that the SSA properly determined that Ashe's bid need not be disqualified, we have assumed that J & D was correct in alleging the bid was "mathematically unbalanced," an assumption shared by the GAO. That premise, however, does not go unchallenged. Ashe stated that [its bid strategy and pricing was not unbalanced.] Ashe did not place [inappropriate costs] in the FFP portion of its bid, as it indicated in response to questions regarding its pricing. AR 1367.

J & D argued at the hearing that Ashe was required to assign [certain costs different from the manner in which Ashe had done.] The plaintiff could cite no authority for this requirement, and we find none in the RFP, the FAR, or in case law.

Based on the premise that Ashe's bid was unbalanced, J & D asserted a variety of claims. Although we have rejected its premise, for the sake of completeness we will discuss these claims briefly.

*Breach of Implied–In–Fact Contract*

■■■ J & D's first count asserts that the government breached an implied-in-fact contract to treat all bidders fairly. This contract is created simply by the government's invitation for bids. *Tri–State Government Services, Inc.,* B–277315, B–277315.1, 97–2 CPD ¶ 143 (Oct. 15, 1997). J & D argues that the government's breach occurred when it accepted Ashe's bid despite the fact that its prices were structured in a manner not permitted by the solicitation. We have concluded that the FAR and RFP only prohibited *materially* unbalanced bids, and that Ashe's bid would be outside the RFP only if it were materially unbalanced and posed an unacceptable risk to the government. We find no breach.

*Ashe's Bid Required Advance Payments*

■■■ J & D next argues that Ashe's bid required advance payments on indefinite quantity line items as a condition of acceptance. That is, that Ashe would receive advance payments for indefinite quantity items before such items were performed. Bids that truly require advance payments are to be rejected. 48 C.F.R. § 32.405(b); *Riverport Indus., Inc.,* 64 Comp. Gen. 441 (1985), 85–1 CPD ¶ 364, *aff'd* B–18656.2 (1985), 85–2 CPD ¶ 108; *Barnard–Slurry Walls,* 97–1 CPD ¶ 23 (Low bid properly rejected as materially unbalanced where lump sum price for preparatory work line item was many multiples higher than reasonable value of work, such that bid was grossly front-loaded, and unit price for work was significantly less than government estimate and other bid prices).

J & D reasons that Ashe structured its bid so it would receive advance payments. The Court does not find J & D's logic persuasive given the structure of Ashe's bid. Ashe will not be prepaid for any non-FFP work because all of the FFP costs are properly associated with the fixed quantities. *BFPE International,* B–248783, 92–2 CPD ¶ 206 (1992). Indeed, one of the reasons the Navy preferred Ashe's bid was a benefit [it provided], which "justifies the fixed price." AR 1466. The Navy accepted Ashe's pricing rationale. J & D has not shown the Navy's

determination in this regard was inappropriate.

*Technical Evaluation*

J & D also argues that Ashe's technical proposal was nonresponsive to material requirements and as such should have been rejected or not included within the competitive range. J & D's position is that the government knew that Ashe's prices were mathematically unbalanced and should thus have conducted mathematical analyses to determine whether Ashe's prices were materially unbalanced under a variety of scenarios.

We find that the government had no burden to perform other analyses to determine the existence of a material lack of balance. Even assuming Ashe's bid would be materially unbalanced if the Navy's indefinite quantity estimates proved to be inaccurate, there was no basis, and there continues to be no basis to suspect the accuracy of the indefinite quantity estimate. Moreover, the Navy was under no obligation to consider other scenarios in which the IQ work was different from the estimates. In fact, it would have been improper for it to have done so. The RFP stated in Section M that the bids would be evaluated based on total price, that is, fixed quantity plus estimated indefinite quantity. It would have been improper to change this without prior notice to the bidders.

J & D also argues in this regard that Ashe's [bidding strategy] makes the bid nonresponsive, and it therefore should have been rejected. [This argument is not supported by the solicitation]. Solicitation, Part 1, § B.3.

*Arbitrary, Capricious, or Bad Faith Rejection*

■■■ In addition to the unbalanced bid challenges, J & D argues that the Navy acted in a manner that was arbitrary, capricious, an abuse of discretion, and in bad faith when the SSA rejected the TEB's recommendation to lower Ashe's rating from Highly Satisfactory to Acceptable. J & D bases this argument on two anomalies in the record. First, the Post–Negotiation Business Clearance Report contains an attachment containing a TEB narrative which states [that a certain aspect of Ashe's bidding strat-

egy is]: *"unacceptable!!"* (Emphasis original). AR 1552. However, in the TEB's re-evaluation, issued on or about November 16, 1998, the word and punctuation "unacceptable!!" do not appear. AR 1274. Second, the Post–Negotiation Business Clearance Report is dated January 13, 1999. AR 1467. However the chairman of the SSB's declaration indicates it was signed on February 25, 1999.

J & D's burden is to prove prejudicial error by at least a preponderance of the evidence. Two errors in the paper record, or even in the evaluation process, hardly qualify as meeting this evidentiary burden. *Andersen Consulting v. United States,* 959 F.2d 929, 932 (Fed.Cir.1992) ("Any good lawyer can pick lint off any Government procurement. We will not set aside an award, even if violations of the law are found, unless those violations have some significance."). Furthermore, the government enjoys a presumption of having acted in good faith. *Krygoski Construction Company, Inc. v. United States,* 94 F.3d 1537, 1541 (Fed.Cir.1996). The government admits that it does not know why, specifically, the term "unacceptable!!" dropped out between reports. J & D seeks to cite these defects as evidence of dark doings. There are many possible explanations for the defects, including simple administrative negligence, and nothing compels or even suggests official misdeeds. The Navy's failure to have a perfect record is not a showing of arbitrary or capricious conduct, nor an some copies is completely irrelevant. The TEB presumably knew what it itself had written. Despite this characterization of "unacceptable!!," and after receiving further information and conducting further analysis, the TEB changed its recommendation to Acceptable.

Finally, J & D argues that the SSA's acceptance of a "nonresponsive" price proposal and overruling of the TEB's technical rating was without sufficient reason and is indicative of arbitrary or capricious conduct, or an abuse of discretion or an act of bad faith. Once again, the Court disagrees. The FAR places ultimate responsibility on the SSA, who may substitute its judgment for those of its advisory groups. 48 C.F.R. § 15.303 states:

> (a) ... The contracting officer is designated as the source selection authority, unless the agency head appoints another individual for a particular acquisition or group of acquisitions.
> (b) The source selection authority shall—
> \* \* \* \* \* \*
> (5) Consider the recommendations of advisory boards or panels (if any); and
> (6) Select the source or sources whose proposal is the best value to the Government. ...

Even the TEB ultimately found Ashe's bid responsive, although it gave it a technical rating of only Acceptable. Further, the SSB disagreed with the TEB's determination that Ashe's technical rating be downgraded to Acceptable based on Ashe's [bid strategy]. AR 1466; AR 1680. The SSB found instead that there were no errors of pricing, and that [Ashe's bid strategy] was an acceptable business practice. AR 1466; AR 1680.

As the regulation cited above clearly states, the determinations of advisory boards and panels are only for purposes of recommendations. The SSA makes the final decision. The SSA considered the TEB's determination and rejected it. The SSA concluded that Ashe's approach presented no performance risk and that Ashe's prices were reasonable. AR 1662.

Given the evaluation of the SSB and the SSA, J & D has failed to meet the heavy burden of showing that the SSA acted irrationally, let alone in bad faith. *Baird v. United States,* 1 Cl.Ct. 662, 664 (1983).

### CONCLUSION

J & D has failed to show by even a preponderance of the evidence that the Navy breached an implied-in-fact contract, that Ashe's bid required advance payments, or that Ashe's bid was nonresponsive and should have been rejected. It has failed to allege facts that show that the Navy's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

THEREFORE, J & D's motion for summary judgment is hereby DENIED and the government's motion for judgment on the

administrative record is GRANTED. The Clerk of the Court is directed to enter judgment for defendant and intervenor, and dismiss the complaint.

**IT IS SO ORDERED.**