**AL GHANIM COMBINED GROUP CO. GEN. TRAD. & CONT. W.L.L., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 03–271C.

United States Court of Federal Claims.

May 22, 2003.[1]

---

1. This opinion was issued under seal on May 8, 2003. Pursuant to ¶ 4 of the ordering language, the parties identified protected/privileged materi-

al subject to deletion. Brackets denote the deleted material.

Sam Z. Gdanski, Suffern, NY, for plaintiff. Scott H. Gdanski, of counsel.

Lauren S. Moore, Washington DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. Robert J. McKenney, United States Army Corps of Engineers, of counsel.

### *OPINION*

MILLER, Judge.

This case comes for decision after argument on the parties' cross-motions for judgment on the administrative record. Pursuant to 28 U.S.C. § 1491(b)(1) (2002), plaintiff contractor initiated a post-award protest seeking injunctive relief requiring the U.S. Army to resolicit a construction contract. Plaintiff bases its protest on alleged flaws in the agency's evaluation of the proposal submitted by the awardee. Defendant denies that the procurement process was conducted contrary to any applicable regulations or statutes or was arbitrary and capricious.

### FACTS

The following facts derive from the administrative record. On November 22, 2002, Col. Charles O. Smithers III, U.S. Army Central Command–Kuwait, issued a memorandum to the Gulf Regional Engineer of the U.S. Army Corps of Engineers (the "Corps"). Col. Smithers requested that the Corps provide "contracting and construction management support to execute a limited competition" indefinite delivery/indefinite quantity ("IDIQ") contract, performance of which would take place in Kuwait. This "very unusual requirement" was necessary owing to the "war on terrorism, Operation Enduring Freedom, and pending armed conflict with Iraq. Thousands of soldiers are expected to be transported to a desert environment which currently has no facilities to receive or house them." Consequently, competition for

the contract would be limited to "local Kuwaiti firms" that had completed prior contracts for the U.S. military satisfactorily.

Bunnatine H. Greenhouse, the Corps's Principal Assistant Responsible for Contracting, executed a "Memorandum for Commander" on December 29, 2002, approving the request for limited competition on the IDIQ contract. Although Ms. Greenhouse opined that this project was "not the proper use of the IDIQ contract," she determined that granting the request was in the best interest of the Corps "because of the [project's] national security implications."

On December 9, 2002, the Camp Doha Installation Support Office of the Corps issued a request for proposals for solicitation No. DACA78–03–R–0008, covering primarily the construction of hardstands and support facilities to house temporary personnel at various locations in Kuwait. The deadline for submissions was December 17, 2002, and the resultant contract would be for a one-year term.

Section 00010 [2] of the solicitation contained 59 contract line item numbers, or "CLINs," which detailed the various tasks required to complete the project. The CLINs were divided into eight categories, including general site work, roads and hardstands, and miscellaneous structures. Attachment 2 to the solicitation was an IDIQ sample pricing schedule, where 52 representative CLINs from Section 00010 were listed. None of the seven CLINs for engineering services, grouped under 0001 in Section 00010, appeared in Attachment 2.

After opening the project for proposals, the Corps issued Amendment 0001 to the solicitation on December 11, 2002. The amendment altered the language appearing in part A of Section 00010 of the solicitation, captioned Evaluation Criteria for Award.[3] The preface to part A stated that the Corps would engage in a two-part analysis when

reviewing proposals: "Award will be made to the responsible offeror who submits the lowest priced offer, which is also technically acceptable to the Government." The contracting officer and her staff intended "to evaluate only the three lowest priced proposals for technical acceptability;" if one of these proposals proved deficient, then the fourth-lowest priced proposal would be reviewed for technical acceptability. This process would continue until the Corps found three technically competent proposals. "Award will then be made to the lowest-priced, technically acceptable offeror."

Following this introduction, part A was subdivided into two headings: Technical (Non–Pricing Criteria) and Pricing Criteria. Three subheadings were included in the technical section: Past Performance, Experience, and Management Capability. Only one subheading, Price, appeared in the Pricing Criteria section. This section explained that the lowest priced offer would be determined by the CLIN prices submitted in the IDIQ Sample Pricing Schedule at Attachment 2. It also advised that the unit quantities in Attachment 2 did not reflect a "typical" scope of work under the contract. The following language, the meaning of which the parties heatedly dispute, then appeared:

> Each price will be evaluated to assess the offeror's understanding of the scope of work for the ... *sample* [4] task project included in the solicitation. Each offeror's proposed price will be compared to one another in order to establish the order of the lowest priced proposals. In addition, each offeror's proposed price will be compared with the Government Estimate.

The parties manifest similar disagreement as to how the Corps evaluated the proposals. The Corps received 21 proposals by the December 17, 2002 deadline, but only 20 were reviewed owing to the Corps's determination

---

**2.** Both the contract language and the parties refer to this section interchangeably as "Section 00010" and "Section 00100." For the purposes of this opinion, the court employs "Section 00010."

**3.** This heading in the solicitation appears in capital letters, as do many other designations that

will be discussed. This opinion does not replicate the capitalization of terms or phrases.

**4.** The underscored portions of quoted language from part A represent additions made by Amendment 0001 to the solicitation.

that the twenty-first proposal was non-responsive. Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. ("plaintiff"), a commercial entity organized under the laws of Kuwait, timely submitted a proposal. Plaintiff previously had performed large construction contracts for the U.S. Navy, Marines, and Army.

The parties agree that the Corps first engaged in a technical evaluation of the submitted proposals. The Technical Evaluation Team (the "TET") assigned to the solicitation was comprised of five members. Four of these members constituted the Non-pricing Evaluation Team (the "NET"), but only three members had voting rights; the fourth, Margaret A. Jones, was the chair of the TET and a Project Manager for the Corps. According to a December 19, 2002 memorandum for record executed by the four NET members, the NET performed the technical evaluation on December 18–19, 2002. The NET first reviewed the evaluation criteria from Section 00010, the source selection plan, and the worksheets to be used to assess a proposal's technical sufficiency. From this review the NET determined that "there was a requirement for each of the evaluators to first perform an independent and separate review of the offer[or's] submission and then to conduct a consensus of the evaluations." Consequently, each member first would evaluate a proposal independently, after which the members would reach a consensus regarding the proposal.

The NET used worksheets to evaluate the proposals. Each proposal was assessed on a pass/fail basis, which the NET, as reflected in its December 19 memorandum for record, took "literally, [i.e.,] [t]here should not be an evaluation of the 'quality' of the offeror's submission . . . ." The worksheets were divided into a number of categories, and an evaluator would indicate for each of these categories whether a proposal warranted a "pass" or "fail," with some categories offering an additional choice of "neutral." The evaluator

then would complete a ratings summary for the proposal, where he or she would pass or fail the proposal on the three primary technical factors: Past Performance, Experience, and Management Concepts.[5] Although the worksheets provided space for a NET member to supply narrative justification for each choice, none of the NET members did so. If a proposal garnered a fail rating in one of the three categories, the proposal was deemed technically unacceptable; for example, if an offeror did not satisfy the criteria for Experience, that offeror received a fail rating for that category and a fail rating for the offer.

Plaintiff labels the NET's technical evaluation as devoid of any substantive analysis; defendant counters that completing the ratings of "pass" or "fail" constitute an acceptable technical analysis.

The NET was required to review the 14 lowest priced proposals before three were deemed technically acceptable. The offerors that submitted the three lowest priced proposals, as well as seven other offerors considered by the NET, failed the technical evaluation because they did not pass the requirements of the experience factor. The NET found the three technically acceptable, lowest priced proposals before reviewing plaintiff's submission.

After paring down the proposals based on the technical criteria, the Corps undertook a price evaluation, headed by Frank R. Kelly, a Price Evaluator and Project Manager for the Corps. It is undisputed that an offeror was required to submit a price for each CLIN appearing in Section 00010 and Attachment 2; if a CLIN appeared in both sections of the solicitation, the offeror was required to submit the same price for that CLIN. The offeror used the CLIN prices that it submitted in the IDIQ Sample Pricing Schedule at Attachment 2 in order to calculate the total price for its proposal. The offeror first multiplied the price that it submitted for an individual CLIN by the Corps's quantity estimate for that task.[6] After performing this calculation

---

5. For Past Performance a rating of neutral could be assessed, instead of pass or fail. For the categories of Experience and Management Concepts, only a rating of pass or fail could be given.

6. The quantity estimates appeared in a chart entitled "IDIQ Contract, Kuwait, DACA78–03–R–0008, Government Estimate-'Revised.'" This chart listed a quantity estimate and a unit price

for all 52 CLINs in Attachment 2, the offeror aggregated the amounts for each CLIN to arrive at a total price.

In a December 19, 2002 memorandum, Mr. Kelly and Ms. Jones, in their capacities as co-project managers, explained the process for completing the price analysis of the proposals. The Corps employees prepared an abstract and a spreadsheet of the proposals; the spreadsheet was employed to compare an offeror's "prices" with those appearing in other proposals and in the government estimate. The project managers then stated:

> In accordance with Section 00100, Evaluation Criteria, paragraph 4, Price, the requirements for evaluation were to determine the three lowest-priced offerors for the representative task provided in the IDIQ Sample Pricing Schedule which were technically acceptable in addition to the completion of pricing for *all* Contract Line Items (CLINS). Each offerors' [sic] proposed price was evaluated for consistency with its Price Section.

The parties agree that the Corps compared each offeror's total price against those submitted by other offerors and that appearing in the government estimate. Plaintiff maintains that the Corps performed no other analysis other than the total price comparison; defendant argues that the Corps "evaluated the prices pursuant to the solicitation." Def.'s Counter-Statement of Fact No. 125, filed Apr. 21, 2003.

On December 23, 2002, Marsha F. Rudolph, the Contracting Officer for the Corps's Transatlantic Programs Center and the Source Selection Authority ("SSA") for the project, certified that Al Hamra Kuwait Co. W.L.L. ("Al Hamra") "is the Technically Acceptable, Low Proposer whose price is determined fair and reasonable." Al Hamra had submitted the fourth-lowest total price, $3,469,327.00, but its proposal was assessed by the NET after the three lowest offerors failed the technical review. Plaintiff's total price of $6,263,198.00 was the sixteenth lowest submitted and was not subjected to a technical review. The Corps awarded the

for each of the 52 CLINs that appeared in At-

IDIQ contract, No. DACA78–03–D–0001, to Al Hamra on December 23, 2002.

On January 3, 2003, Charlotte Cramer, one of the contracting officers assigned to the project, sent letters to the unsuccessful offerors, including plaintiff. Plaintiff's letter explained that it was not selected as the awardee because its "proposed price was higher than the price that was proposed by the successful offer[or]." When notified that it had not been awarded the contract, plaintiff requested a debriefing, which was conducted on January 9, 2003.

Plaintiff filed a protest with the General Accounting Office (the "GAO") on January 14, 2003. Plaintiff alleged that 1) the Corps acted arbitrarily and capriciously in evaluating the proposals, owing to an alleged ambiguity in the solicitation; 2) the Corps's use of quantity estimates in Attachment 2, the IDIQ Sample Pricing Table, resulted in the submission of unbalanced prices; and 3) Al Hamra's proposal failed to satisfy the solicitation requirements. Plaintiff requested a stay pursuant to the Competition in Contracting Act of 1984, 31 U.S.C. §§ 3551–3556 (2002) ("CICA"), but the Corps, due to the impending deployment of American troops to Kuwait, sought an override of the stay, which was approved on January 17, 2003.

Plaintiff withdrew its action before the GAO on January 27, 2003, and turned to the U.S. Court of Federal Claims, initiating the instant protest on February 7, 2003. The court on February 10, 2003, granted plaintiff's motion to file this case under seal and held a status conference on February 11, 2003. The parties filed a Status Report on February 28, 2003, in which the parties agreed to an approximately 30–day time frame for briefing on dispositive motions. Material to the Government's contention of wartime exigencies, the schedule proposed by the parties did not facilitate prompt resolution of this matter. The court adopted this schedule by order of March 3, 2003. Defendant filed a notice of appearance of new counsel on March 21, 2003, and moved, on March 24, 2003, for an enlargement of time to file its dispositive motion, which the court granted the next day. Thereafter, briefing

tachment 2.

was completed on April 29, 2003, and argument was held on May 1, 2003.

## DISCUSSION

### I. *Standards for injunctive relief*

Plaintiff requests a permanent injunction canceling the solicitation and ordering the Corps to resolicit proposals from "all offerors who were technically acceptable or not evaluated." Pl.'s Br. filed Mar. 21, 2003, at 58. Defendant resists the charge that the solicitation process was flawed and argues that an injunction would compromise the war effort in Iraq, which commenced after plaintiff filed its protest.

The Court of Federal Claims maintains jurisdiction, pursuant to the Tucker Act, "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

■ The court evaluates the procuring agency's actions to determine whether its conduct was arbitrary and capricious. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). To prevail under the arbitrary and capricious standard, a frustrated offeror is required to establish that: 1) the Government officials involved in the procurement process were without a rational and reasonable basis for their decision, or 2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Central Arkansas Maint., Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995); *Beta Analytics Int'l, Inc. v. United States,* 44 Fed.Cl. 131, 136 (1999). Under the arbitrary and capricious standard, "the court may not substitute its judgment for that of agency officials." *Lion Raisins, Inc. v. United States,* 51 Fed.Cl. 238, 247 (2001). Rather, the court's inquiry must focus on whether the agency "examined the relevant data," *Motor Vehicle Mfrs.*

*Ass'n of the United States v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), and "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332–33 (Fed.Cir.2001) (quoting *Latecoere Int'l, Inc. v. United States,* 19 F.3d 1342, 1356 (11th Cir.1994)); *see also Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1046 (Fed.Cir.1994); *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir. 1988).

■ "A protestor must show not simply a significant error in the procurement process, but also that the error was prejudicial, if it is to prevail in a bid protest." *Statistica,* 102 F.3d at 1581. To establish competitive prejudice, the protestor must show, "[i]n the absence of an alleged error, . . . a 'substantial chance' that [the protestor] would have received the award." *JWK Int'l Corp. v. United States,* 279 F.3d 985, 988 (Fed.Cir. 2002) (quoting *Statistica,* 102 F.3d at 1581). The Federal Circuit has explained that a protester may satisfy the substantial chance standard if, when its post-award bid protest was successful and the solicitation reopened, it "could compete for the contract once again." *Garufi,* 238 F.3d at 1334. Where the record establishes no reasonable possibility of competitive prejudice to the protestor, a protest should not be sustained, even if a defect in the procurement is found. *Statistica,* 102 F.3d at 1581.

■ A protestor has the burden of proving by a preponderance of the evidence the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement regulation. *See CACI Field Servs.,* 854 F.2d at 466; *R.R. Donnelley & Sons, Co. v. United States,* 38 Fed.Cl. 518, 521–22 (1997); *PCI/RCI v. United States,* 36 Fed.Cl. 761, 767 (1996). If the protestor satisfies its burden, the court may award equitable relief pursuant to 28 U.S.C. § 1491(b)(2). However, injunctive relief sought by a frustrated offeror is appropriate "'only in extremely limited circumstances.'" *CACI, Inc.—Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United*

States v. John C. Grimberg Co., 702 F.2d 1362, 1372 (Fed.Cir.1983)).

## II. Supplementation of the administrative record

Both parties seek to bolster their arguments with declarations executed after plaintiff initiated its lawsuit. Defendant moves to supplement the administrative record with the declaration of Marsha F. Rudolph, who, in her capacity as SSA for the contract, attests that her price analysis conformed with all applicable regulations. Plaintiff submits two declarations from Jimmy J. Jackson, a consultant on government contracts, who argues that the Corps's failure to analyze the proposals correctly calls for a revision of the solicitation and a renewed request for proposals. The court addresses the propriety of supplementing the record with these declarations before reaching the merits of plaintiff's arguments.

### 1. Declaration of Marsha F. Rudolph

Ms. Rudolph's declaration is tendered to counter plaintiff's argument that the Corps failed to comply with Federal Acquisition Regulation (FAR) 48 C.F.R. § 15.404–1 (2003). Plaintiff insists that the administrative record is complete without the declaration; that her declaration constitutes improper supplementation; and, in any event, that Ms. Rudolph's testimony contradicts the price analysis performed by the Corps, as reflected in the December 19, 2002 memorandum for record.

When deciding a motion for judgment on the administrative record, the focal point for judicial review "should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam); see also Advanced Data Concepts v. United States, 216 F.3d 1054, 1057 (Fed.Cir.2000). However, it must be remembered that the "administrative record is a fiction." CCL

Serv. Corp. v. United States, 48 Fed.Cl. 113, 118 (2000). The "administrative record is not a documentary record maintained contemporaneously with the events or actions included in it. Rather, the administrative record is a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court." Tech Systems, Inc. v. United States, 50 Fed.Cl. 216, 222 (2001).

■■■■ Accordingly, the Court of Federal Claims does not "apply an iron-clad rule automatically limiting its review to the administrative record." GraphicData, LLC v. United States, 37 Fed.Cl. 771, 779 (1997). Because the flexibility of the court's scope of review does not give the parties carte blanche to supplement the record, "the judge should determine whether the agency action before the court is susceptible to a record review. If the answer is yes, the judge must limit review to the record." Id. at 780; see also Lion Raisins, 51 Fed.Cl. at 244. If the answer is no, a party may supplement the administrative record when necessary to prove that evidence not in the record is evidence without which the court cannot fully understand the issues. See Lion Raisins, 51 Fed.Cl. at 244. Supplementation is appropriate when the record "still has lacunae that should be filled based on the protestor's challenges." CCL, 48 Fed.Cl. at 119; see also Stapp Towing, Inc. v. United States, 34 Fed.Cl. 300, 307–08 (1995) (listing factors governing when administrative record may be supplemented).[7]

The Supreme Court has made clear that post hoc rationalizations offered by the agency should be afforded limited importance in the court's analysis. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Therefore, the "primary focus of the court's review should be the materials that were before the agency when it made its final decision." Cubic Applications, Inc. v. United States, 37 Fed.Cl. 345, 349–50 (1997).

---

7. The court is aware that other judges in the Court of Federal Claims take a more permissive stance toward supplementing the administrative record. See, e.g., Seattle Sec. Servs. v. United States, 45 Fed.Cl. 560, 565 n. 8 (2000). This court respectfully disagrees with these decisions to the extent that they may be interpreted as allowing supplementation of an administrative record that is facially complete and consequently presents no need for clarification.

In their December 19, 2002 memorandum for record, co-project managers Jones and Kelly explain the process used in reviewing the proposals. To review the 20 responsive proposals,

> [a]n abstract of proposals was prepared and a spreadsheet of the proposals was developed .... The spreadsheet is utilized for comparing the offerors' prices to the Government Estimate as well as to each other. In accordance with Section 00100, Evaluation Criteria, paragraph 4, Price, the requirements for evaluation were to determine the three lowest-priced offerors for the representative task provided in the IDIQ Sample Pricing Schedule which were technically acceptable in addition to the completion of pricing for *all* Contract Line Items (CLINS). Each offerors' [sic] proposed price was evaluated for consistency with its Price Section.

Plaintiff contends that this memorandum reveals that the Corps reviewed only the total prices submitted in the proposals and did not compare the offerors' individual CLIN prices with the Government's price estimates for the same CLINs. It is plaintiff's position that this approach to the price analysis was inconsistent with FAR § 15.404-1(g). This regulation requires all proposals containing separately priced line items to be examined for unbalanced pricing; if it is found, the contracting officer must consider the risks of unbalanced pricing to the Government and decide if the offer should be rejected based on these risks. Plaintiff argues that Al Hamra's proposal was unbalanced, thus posing an unacceptable risk to the Government that was not analyzed properly by the Corps.[8]

Ms. Rudolph avers that she complied with the requirements of FAR § 15.404-1(g) in assessing Al Hamra's price proposal. Declaration of Marsha F. Rudolph, Apr. 3, 2003, ¶ 3 ("Rudolph Decl."). She noticed a disparity between some of the CLIN prices submitted by Al Hamra and those calculated in the revised government estimate. *Id.* She then consulted with Ms. Jones, one of the project managers, and was informed that task orders under the contract likely would involve a combination of CLINs.[9] *Id.* ¶ 4. This conversation prompted Ms. Rudolph to deduce that the CLINs priced below the government estimate would counterbalance those priced higher than the estimate, thereby creating an overall favorable price to the Corps without a corresponding unacceptable risk. *Id.* ¶¶ 5–6.

In *Lion Raisins* this court granted plaintiff raisin manufacturer's motion to strike the declaration of an agency official who attempted to support plaintiff's suspension by the U.S. Department of Agriculture (the "USDA"). *See* 51 Fed.Cl. at 245–46. The administrative record contained the suspension decision, which was not authored by the declarant. The decision pointed to the falsification of USDA certificates as the primary basis for plaintiff's suspension. The declarant, however, averred that the USDA pinned the decision to suspend plaintiff on an ongoing criminal investigation and an impending award of a large-volume raisin contract.

The court's review function, when deciding the motion to strike, was "limited to consideration of evidence relevant to the substantive merits of the agency's action 'for the limited purposes of ascertaining whether the agency ... fully explicated its course of conduct or grounds for decision.'" 51 Fed.Cl. at 245 (quoting *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980)) (alteration in original). The suspension decision in the administrative record set forth "a rationale that is entirely consistent with the administrative record and therefore not amenable to ... clarification." *Id.* at 246. Because the "administrative record cannot be augmented by [a] .. convenient ... rationale," the motion to strike the declaration was granted. *Id.*

This court is aware, from the Government's briefs filed in a collateral *Lion Raisins* proceeding, that the Government regards the rejection of post-award supplementation of a record as heresy, so it is

---

8. Plaintiff's argument that Al Hamra's proposal manifested unbalanced pricing is discussed *infra* III.

9. No evidence of this conversation appears in the record, even though Ms. Jones co-authored the memorandum summarizing the Corps's price analysis.

important to separate what *Lion Raisins* sponsors from the parade of horribles envisioned by the Government. Defendant certainly would agree that a *deus ex machina* rationale should not save an administrative decisionmaking process when a rationale for the decision on review is self-explanatory and not superseded by an overriding concern like national security. *See* 28 U.S.C. § 1491(b)(3). *Lion Raisins* involved the unusual circumstance wherein the Government did not advance the true reason for suspending a contractor from bidding on government contracts, ostensibly in order to avoid compromising an ongoing criminal investigation. However, the facts adduced by the Government did not justify the rationale that secrecy was necessary at the time, because plaintiff already knew of the investigation: Plaintiff had been subpoenaed in connection with it before the suspension issued. Defendant in the case at bar attempts to use Ms. Rudolph's declaration in the same manner as defendant in *Lion Raisins*—to supplement a facially complete record. No part of the analysis appearing in Ms. Rudolph's declaration is reflected in the December 19, 2002 memorandum, which contains a full explanation of how the Corps performed its price analysis.[10]

■ During oral argument defendant pressed the GAO's decision in *Sayed Hamid Behbehani & Sons, W.L.L.,* Comp. Gen. Dec. B–288818.6, 2002 CPD ¶ 163, 2002 WL 31159457, 2002 U.S. Comp. Gen. LEXIS 144 (Sept. 9, 2002), as supplying the proper framework for gauging the appropriateness of record supplementation. It is well settled that the Court of Federal Claims is "not bound by the views of the Comptroller General." *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980). Moreover, the GAO applies a standard regarding supplementation that differs from that in the Court of Federal Claims. The GAO "consid-

ers the entire record in determining the reasonableness of an agency's award decision, including statements made in response to a protest, [but it] accord[s] greater weight to contemporaneous materials rather than judgments made in response to protest contentions." *Johnson Controls World Servs., Inc.,* Comp. Gen. Dec. B–289942, *et al.,* 2002 CPD ¶ 88, 2002 WL 1162912, 2002 U.S. Comp. Gen. LEXIS 70 (May 24, 2002). The GAO's response to a *post hoc* rationalization is to accord it diminished credibility. *See, e.g., Beacon Auto Parts,* Comp. Gen. Dec. B–287483, 2001 CPD ¶ 116, 2001 WL 823301, 2001 Comp. Gen. LEXIS 111 (June 13, 2001). The Court of Federal Claims does not make credibility determinations in reviewing an administrative record.

■ Nevertheless, an analysis of *Behbehani* reveals that it is not inconsistent with the court's guideposts on supplementation. In *Behbehani* the administrative law judge relied on the declaration of the contracting officer, which was prepared after contract award. Consideration of the statement was proper "[w]here, as here, a post-protest explanation simply fills in previously unrecorded details of contemporaneous conclusions." 2002 WL 31159457, at *4, 2002 U.S. Comp. Gen. LEXIS 144, at *11 n. 2. If the "explanation is credible and consistent with the contemporaneous record," the trier of fact properly may consider it. *Id.* Ms. Rudolph's statements cannot be characterized as "contemporaneous conclusions," as there is nothing in the record with which the court may harmonize them. Instead, Ms. Rudolph's declaration purports to explain the entire analysis performed under FAR § 15.404–1(g).

Because defendant is engaged in "quintessential *post hoc* rationalization," *Lion Raisins,* 51 Fed.Cl. at 245, defendant's motion to supplement the administrative record is denied[11] insofar as the declarant supplies the

---

**10.** In an effort to save the declaration, defendant cites to this court's decision denying defendant's motion to strike two affidavits submitted by plaintiff in *Tech Systems. See* 50 Fed.Cl. at 222. The affidavits in *Tech Systems* were necessary for the court to evaluate statements and facts in the administrative record. In the case at hand, the

court does not need the assistance of documentation outside the record in order to render a decision.

**11.** The court's decision to reject Ms. Rudolph's declaration does not implicate the presumption that government officials act in good faith when

elements missing from the already completed price analysis.[12] Ms. Rudolph's declaration, however, addresses subjects other than the price analysis. The court allows consideration of ¶¶ 7–8 of the declaration, as these paragraphs discuss the impact of a permanent injunction on national security, an issue addressed *infra* V that is of paramount and superseding importance in the review of a procurement decision. *See* 28 U.S.C. § 1491(b)(3).

### 2. *Declarations of Jimmy J. Jackson*

■ Plaintiff submits the declarations of Jimmy J. Jackson, a consultant whom plaintiff deems an expert owing to his "extensive experience with government contracts." Pl.'s Br. filed Mar. 21, 2003, at 9–10.

Mr. Jackson's first declaration concludes that the Corps "failed to perform any price realism analysis." Declaration of Jimmy J. Jackson, Mar. 14, 2003, ¶ 4. This failure was contrary to the solicitation's evaluation criteria and resulted in the Corps's awarding the contract without first assessing whether Al Hamra understood the scope of the work required of it. *See id.* ¶ 10. Al Hamra proposed unrealistic prices for ten of the 17 "most important CLINs." *Id.* ¶ 16. Based on a price realism analysis performed on the

proposals of Al Hamra, plaintiff, and two other offerors, Mr. Jackson opines that all of the proposals had "a significant portion of their prices that are unrealistic, as measured by the ... Government Estimates. Therefore, the [Corps] has no valid basis, based on the Solicitation's selection criteria, to award a contract." *Id.* ¶ 19. The solicitation, in Mr. Jackson's opinion, must be modified to reassess the scope of work required for each CLIN. *Id.* ¶¶ 4(c), 22.

Plaintiff submitted a second declaration from Mr. Jackson in its opposition to defendant's cross-motion for judgment. Mr. Jackson does not alter any of the conclusions reached in his first declaration; instead, he declares that defendant's filings in support of its cross-motion actually fortify his opinions. *See* Second Declaration of Jimmy J. Jackson, Apr. 17, 2003, ¶¶ 2, 3 n. 1. The thrust of the new material presented by Mr. Jackson is that the Corps erred in assuming that Al Hamra's proposal was intentionally mathematically unbalanced, *id.* ¶ 7, and that Ms. Rudolph's determination that Al Hamra's proposal was not materially unbalanced was inadequate, *id.* ¶¶ 11–14.

Although plaintiff does not move to supplement the administrative record with the two declarations submitted by Mr. Jackson, plaintiff purports to rely on Mr. Jackson's

performing their duties. *See Am–Pro Protective Agency v. United States*, 281 F.3d 1234, 1240 (Fed.Cir.2002); *T & M Distributors, Inc. v. United States*, 185 F.3d 1279, 1285 (Fed.Cir.1999). Rather, the court rules based on the fact that the record contains ample written justification of the Corps's price analysis, so no legitimate reason has been presented to allow the Government to supplement the administrative record on this issue.

**12.** Even if the court were to allow Ms. Rudolph's declaration, it would not aid defendant's argument that the Corps performed the price analysis required by FAR § 15.404–1(g). The "analysis" reflected in Ms. Rudolph's declaration is nonsensical.

Based on a conversation with the project manager for the solicitation, Ms. Rudolph concluded that, because each task order would likely contain a mix of CLINs, "those CLINS that were above the Government Estimate were likely to be balanced by those which were below the Government Estimate, creating an overall favorable price to the Government." Rudolph Decl. ¶ 5. Ms. Rudolph makes no effort to amplify her

reasoning that an unknown mix of CLINs in each task order would result in a favorable price to the Government, apparently failing to consider that, for example, the mixture of CLINs ordered under the contract for a given task could contain more CLINs for which Al Hamra's prices grossly exceeded those estimated by the Government. *See infra* note 16.

Moreover, defendant during oral argument indicated that Ms. Rudolph's declaration did not reflect the extent of her purported analysis of Al Hamra's CLIN prices. Defendant argued that Ms. Rudolph took into account that more CLINs in Al Hamra's proposal were priced lower than the government estimates. Defendant claims that this information factored into Ms. Rudolph's determination that Al Hamra's pricing structure would create an overall favorable price to the Corps. *See* Transcript of Proceedings, *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, No. 03–271C, at 44 (Fed. Cl. May 1, 2003) ("Tr."). Ms. Rudolph's declaration does not reflect such an analysis—it reflects only her conclusion that, irrespective of the task involved, the higher priced CLINs would counterbalance the lower priced CLINs. *See* Rudolph Decl. ¶ 5.

opinions to bolster its argument that the Government improperly reviewed Al Hamra's proposal and that the solicitation was ambiguous. To the extent that plaintiff seeks to introduce evidence outside the record through Mr. Jackson's declarations, it cannot do so. The declarations do not fill a gap in the record or provide clarification necessary for the court to rule on the cross-motions. *See Cubic Applications,* 37 Fed.Cl. at 342; *see also GraphicData,* 37 Fed.Cl. at 779. Plaintiff attempts to introduce opinion testimony on contract interpretation, which is a matter of law and thus outside of the scope of proper supplementation. *See Input/Output Tech., Inc. v. United States,* 44 Fed.Cl. 65, 69 n. 4 (1999).[13]

Moreover, even if characterized as expert testimony, Mr. Jackson's opinions do not aid the court in its analysis of plaintiff's arguments. Admissible expert testimony, as governed by Fed.R.Evid. 702, "must 'assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Texas Digital Sys. v. Telegenix, Inc.,* 308 F.3d 1193, 1216 (Fed.Cir.2002) (quoting Rule 702 and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Plaintiff's arguments are devoid of complexities that might require expert assistance, and plaintiff's counsel is able to explain its arguments fully without the need of expert testimony. Accordingly, the court does not consider the two declarations filed by Mr. Jackson.

III. *The price analysis*

█ Plaintiff argues that the Corps's evaluation of the prices submitted in the proposals flouted both the solicitation's criteria and applicable regulations. The solicitation and

FAR § 15.404–1(g)(2) required the Corps, in plaintiff's view, "to compare an offeror[']s price proposal to the government estimate to ensure that the offeror[']s price proposal evidences an understanding of the scope of work required by the Solicitation." Pl.'s Br. filed Mar. 21, 2003, at 9. In order to assess an offeror's understanding of the work required under the contract, the Corps was required to compare each of the CLIN prices submitted in Attachment 2 to those appearing in the government estimate. Plaintiff analyzes Al Hamra's CLIN prices against those prepared by the Corps to "illustrate[ ] that Al Hamra did not understand what they were bidding on," *id.,* thereby underscoring the allegedly arbitrary and capricious nature of the Corps's review process.

Defendant first counters that the solicitation does not require a comparison of individual CLIN prices; rather, the NET needed only to compare the offerors' total prices for the contract with the total price in the government estimate. If a CLIN–by–CLIN analysis is called for, defendant, while conceding that Al Hamra's price proposal was mathematically unbalanced, *see* Def.'s Br. filed Apr. 10, 2003, at 11, argues that an agency may award a contract to an offeror that submits mathematically unbalanced prices after assessing the risk of such a proposal under the guidelines of FAR § 15.404–1(g). An agency must reject a materially unbalanced proposal, but plaintiff "cannot show that Al Hamra's offer was materially unbalanced" Def.'s Br. filed Apr. 10, 2003, at 15. Thus, the Corps's "award of the contract to Al Hamra was reasonable and in accordance with the law." *Id.* at 16.

Part A of Section 00010 directed:

---

**13.** The court does not agree with plaintiff's interpretation of *Carothers Construction Co. v. United States,* 20 Cl.Ct. 556 (1990), as standing for the proposition that the "more prudent course of action" is to allow expert testimony on the issue of ambiguity in the contract language. Pl.'s Br. filed Mar. 21, 2003, at 53. *Carothers* involved a potential ambiguity in a contract and was decided on the parties' cross-motions for summary judgment, a procedural posture that differs from cross-motions for judgment on the administrative record. *See* RCFC 56.1; *Tech Systems,* 50 Fed. Cl. at 222 ("A motion for judgment on the administrative record is not a true motion for sum-

mary judgment."). The expert declarations submitted in *Carothers* led the court to conclude that a trial was required, as there was a disputed issue as to whether the ambiguity was latent or patent. 20 Cl.Ct. at 563–64. While the court did indicate that, assuming the ambiguity was latent, the "experts' testimony will be instrumental in sustaining plaintiff's interpretation [of the disputed language] as reasonable," *id.* at 564, this language does not speak to the need for expert testimony in a bid protest action where the record is complete on its face, irrespective of the factual disharmonies noted by both parties.

**General:**

Award will be made to the responsible offeror who submits the lowest priced offer, which is also technically acceptable to the Government. Each offeror shall price and should describe how it would perform the representative task (reference Attachment [2] IDIQ Sample Pricing Table) supported by the requested information on price (see Price Schedule Section 00010). The representative task reflects the major elements of the work that could be ordered under the IDIQ contract.

Under the Pricing Criteria heading, also listed in part A, appears the following:

**4. Price (a factor):**

**4.1.** Price will not be scored. *The lowest priced offer will be determined by the offeror's total price for the representative task provided in the IDIQ Sample Pricing Schedule at Attachment 2. The IDIQ Sample Pricing Schedule will be used only for the propose of bid evaluation. The quantities used in this schedule are for this sample only, and do not necessarily reflect a "typical" scope of work for task orders to be issued under this contract.* Each price will be evaluated to assess the offeror's understanding of the scope of work for the ... *sample* task project included in the solicitation. Each offeror's proposed price will be compared to one another in order to establish the order of the lowest priced proposals. In addition, each offeror's proposed price will be compared with the Government Estimate. Each offeror's proposed price shall *also* be evaluated for consistency with its Price Schedule, *Section 00010, ... which* will become a part of the contract when awarded. *Offeror's* [sic] *shall use the same unit prices for the IDIQ Sample Pricing Schedule and the contract Price Schedule in Section 00010. The prices in the Price Schedule, Section 00010, will be used for all task order work under the contract after award.*

**4.2.** The offeror shall provide a price for *all* Contract Line Items (CLINS) as indicated in the Price Schedule included in Section 00010 *and in the IDIQ Sample Pricing Schedule at Attachment 2.* Failure to provide the required information will result in the offeror being non-responsive.

Plaintiff hinges its argument that the solicitation required a review and comparison of an offeror's individual CLIN prices on the solicitation's guarantee that "[e]ach price will be evaluated to assess the offeror's understanding of the scope of work ...." *See, e.g.,* Pl.'s Br. filed Mar. 21, 2003, at 25. The court agrees that this language appears to support plaintiff's argument; moreover, the criteria implicate plaintiff's accurate restatement of FAR § 15.404–1(g) to the effect that every "fixed price contract ... requires a review of whether a low price indicates an offeror's lack of understanding of the solicitation's requirements or constitutes an excessive risk." *Id.*

FAR § 15.404–1(a)(1) specifies the techniques that the contracting officer must use "to ensure that the final [contract] price is fair and reasonable." FAR § 15.404–1(g)(1) addresses unbalanced pricing, which "exists when, despite an acceptable total evaluated price, the price of one of more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques." The regulation recognizes that the "greatest risks associated with unbalanced pricing occur" when the price to be evaluated, *inter alia,* "is the aggregate of estimated quantities to be ordered under separate line items of an indefinite-delivery contract." FAR § 15.404–1(g)(1)(iii).

Thus, the applicable regulations require that an agency reviewing a proposal containing CLINs perform a cost analysis to determine, among other potential pitfalls, whether the unit prices are unbalanced. The administrative record, however, reveals that the Corps performed no cost analysis whatsoever.

In their December 19, 2002 memorandum for record, co-project managers Jones and Kelly explained the process by which the pricing aspect of the proposals were reviewed. Paragraph 1 recites that the Corps received 21 proposals, but that only 20 were subjected to a technical review because one proposal failed to include CLIN prices for the IDIQ Sample Pricing Schedule at Attachment 2.

Paragraph 2 of the memorandum explains how the Corps assessed the remaining 20 proposals:

An abstract of proposals was prepared and a spreadsheet of the proposals was developed .... The spreadsheet is utilized for comparing the offerors' prices to the Government Estimate as well as to each other. In accordance with Section 00100, Evaluation Criteria, paragraph 4, Price, the requirements for evaluation were to determine the three lowest-price offerors for the representative task provided in the IDIQ Sample Pricing Schedule which were technically acceptable in addition to the completion of pricing for *all* Contract Line Items (CLINS). Each offerors' [sic] proposed price was evaluated for consistency with its Price Section.

Paragraph 3 supplies a list of the 14 lowest priced offerors. Each of these proposals was reviewed before the Corps found three proposals that were technically acceptable. Two charts, one of which presumably represents the spreadsheet that was prepared, are appended to the memorandum. Both charts compare the total price submitted by each offeror to the total price contained in the government estimate. One chart organizes the offerors from lowest to highest total price, while the other lists the offerors in numerical order.[14] Nowhere in the memorandum do the two project managers state that the individual CLIN prices in the proposals were analyzed.

Thus, the Corps compared the offerors' total prices against one another and the government estimate. The documentation in the record contains no indication that the Corps engaged in any cost analysis, as required by FAR § 15.404–1(a)(1).

In *J & D Maintenance and Services v. United States,* 45 Fed.Cl. 532 (1999), the court decided a post-award bid protest in which the protestor alleged that the awardee's pricing structure was unbalanced. In rejecting the protestor's argument, the court noted repeatedly that the Navy, the agency at issue, had performed the requisite cost analysis. For example, the administrative record reflected that the "Navy specifically focused on whether [the awardee's] bid was unbalanced." 45 Fed.Cl. at 534. The Navy also "explicitly concluded that [the awardee's] offer was not unreasonably priced and did not pose an unacceptable risk of performance." *Id.* at 537. Similarly, in *Red River Service Corp.,* Comp. Gen. Dec. B–282634, *et al.,* 99–2 CPD ¶ 31, 1999 WL 644445, 1999 U.S. Comp. Gen. LEXIS 144 (July 15, 1999), the awardee's proposal evidenced unbalanced pricing, but the Navy engaged in extensive pre-award discussions with the awardee that were reflected in the administrative record. The Navy requested, for example, that the offeror justify its proposed prices for many of the fixed-price and indefinite-quantity line items. The offeror responded to the Navy's concerns, explaining, *inter alia,* that "its pricing was based on its own competitive pricing strategy ...." 1999 WL 644445, at *2, 1999 U.S. Comp. Gen. LEXIS 144, at *6. Satisfied that its pricing structure did not pose an unacceptable risk, the Navy awarded the contract to the offeror.

In the case at bar, the administrative record does not show that the Corps performed a cost analysis whereby the individual CLIN prices were analyzed, and the court cannot assume that an analysis was performed where the record indicates otherwise. *See Beacon,* 2001 WL 823301, at *6, 2001 U.S. Comp. Gen. LEXIS 111, at *16 (sustaining protest when "contemporaneous record simply does not reflect that the agency performed" the necessary analysis).

Defendant underscores the fact that a cost analysis was not performed by arguing that the solicitation did not require an analysis of individual CLIN prices. Pointing to the solicitation's statement that "each offeror's proposed price will be compared with the Government's estimate," defendant submits that the use of "price," in the singular, "plainly requir[ed] a comparison of a single, total price submitted by an offeror with another total price, *i.e.,* the government estimate or another offeror's total price." Def.'s Br. filed

---

**14.** The Corps assigned each offeror a number, presumably to enable the Corps to evaluate proposals without knowing the identity of the offerors. The charts do not indicate the process by which an offeror received its identification number.

Apr. 29, 2003, at 3. It then claims that a CLIN–to–CLIN analysis would have been impossible, because the government estimate did not contain unit prices for the seven CLINs that covered engineering services.

While the court agrees that the estimate does not cover the seven engineering CLINs,[15] defendant neglects to mention that the regulations covering cost analyses apply regardless of the solicitation's structure. Because the court will not allow defendant's *post hoc* declaration in which the SSA purports to engage in the balancing analysis, nothing in the administrative record reflects that the SSA performed the analysis required of her.

Defendant also cannot justify the award of the contract to Al Hamra by resting on Ms. Rudolph's certification that Al Hamra's proposal was the lowest priced, technically

acceptable proposal submitted. This perfunctory conclusion does not constitute an analysis. *See Natural Res. Def. Council v. Hodel,* 865 F.2d 288, 299–300 (D.C.Cir. 1988). The general rule is that, even if an offeror's total price is lower than those proposed by other offerors, a protest still may be sustained if "the low price indicates the offeror's lack of understanding of the solicitation's requirements or constitutes an excessive risk." *M–Cubed Info. Sys., Inc.,* Comp. Gen. Dec. B–284445, *et al.,* 2000 WL 656188, 2000 CPD ¶ 74, 2000 U.S. Comp. Gen. LEXIS 60, at *19–*20 (Apr. 19, 2000).

Although plaintiff and defendant focus much of their arguments regarding pricing on whether Al Hamra's proposal evidenced unbalanced pricing,[16] the court declines to speculate on what the analysis would have revealed. The omission is a price analysis; [17]

15. The government estimate includes only the CLINs appearing in Attachment 2. Attachment 2, for a reason not apparent in the record, did not contain any of the CLINs covering engineering services.

16. Plaintiff takes great pains to point out the disparity between the prices offered by Al Hamra and those in the government estimate for some of the CLINs in Attachment 2. For example, for CLIN 2–AB, "Clear and grub/disposal," Al Hamra submitted a unit price of [ ], while the Corps had calculated an estimated unit price of [ ]. Defendant admits that the estimate is [ ] higher than Al Hamra's unit price for this CLIN. For CLIN 3–AA, "Remove up to 150 mm unsatisfactory mat'l," Al Hamra submitted a unit price of [ ]. The Corps projected a unit price of [ ], resulting in a disparity of [ ]. For CLIN 6–AA, "Construct uncompacted berm, 2m high × 8m base," Al Hamra's unit price of [ ] was [ ] lower than the Corps's estimate of [ ]. The CLIN price which showcased the largest disparity was for 5–AB, "Construct tracked vehicle pad and wash rack." Al Hamra's unit price was [ ], while the government estimate was [ ]. The estimate was [ ] higher than Al Hamra's price. On the whole, defendant admits there are "five CLINs for which the Government Estimates are [more than] [ ] higher than Al Hamra's prices," Def.'s Counter–Statement of Fact No. 117, and 12 CLINs for which the estimates are more than [ ] higher than Al Hamra's unit prices, *id.* at No. 118.

Al Hamra also proposed prices that were much higher than the government estimate for certain CLINs. For CLIN 7–AA, "Shower unit, field constructed, with utilities," the government estimate of [ ] was [ ] of Al Hamra's unit price of [ ]. The government estimate of [ ] for CLIN 7–AI, "Toilet, 4–hole, burn out," was also

[ ] of Al Hamra's unit price of [ ]. All told, the government estimates were less than [ ] of Al Hamra's unit prices for four CLINs.

Finally, plaintiff cites two CLINs—8–AC, "Provide electrical distribution system for typical 576–man module," and 7–AD, "Laundry trailer, with utilities,"—"which clearly evidence" unbalanced pricing. Pl.'s Br. filed Mar. 21, 2003, at 29. Al Hamra's unit prices for these two CLINs, when multiplied by the applicable quantity estimates, totaled [ ]. The estimate's total price for these two CLINs was [ ]. Thus, the two CLINs represented [ ] of Al Hamra's total price, yet only [ ] of the Government's estimated total price.

17. The court's conclusion that the Corps failed to perform a cost analysis in violation of the applicable regulation obviates the need to address defendant's contention that the Corps was required to reject Al Hamra's proposal only if it was materially unbalanced. A distinction exists between materially and mathematically unbalanced proposals. *See Andersen Consulting v. United States,* 959 F.2d 929, 933 (Fed.Cir.1992). A material imbalance "occurs if an award fails to represent the lowest ultimate cost to the Government or the imbalance is such that it will adversely affect the integrity of the bidding system." *SMS Data Prods. Group, Inc. v. United States,* 900 F.2d 1553, 1557 (Fed.Cir.1990) (citation omitted). While the court does not make a finding that the contracting officer acted arbitrarily and capriciously by failing to find that Al Hamra's proposal was materially unbalanced, it is instructive to note that a significant disparity in only one CLIN price may justify the rejection of a proposal as unbalanced. *See L.W. Matteson, Inc.,* Comp. Gen. Dec. B–290224, 2002 CPD ¶ 89, 2002 WL 1067332, 2002 U.S. Comp. Gen. LEXIS

the court finds that the Corps did not evaluate the ratio between the CLINs.

Based on the failure to compare Al Hamra's and the Corps's CLIN prices, the Corps's pricing analysis has violated an applicable procurement regulation, ·which constitutes a "significant ... error in the procurement process." *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed. Cir.1999). In order to obtain a permanent injunction, plaintiff also must show that the award of the contract to Al Hamra was prejudicial. *See id.* Plaintiff has satisfied this standard. A protester is required to demonstrate that a substantial chance existed that it would have received the award absent the flaw in the procurement process. *JWK,* 279 F.3d at 988. The substantial chance standard is satisfied if the protestor can show that, if its post-award bid protest were granted and the solicitation were reopened, it "could compete for the contract once again." *Garufi,* 238 F.3d at 1334. No indication is present that plaintiff could not compete for the contract if it were resolicited; in fact, plaintiff has stated its plans to do so if this court enters a permanent injunction.

### IV. *Plaintiff's arguments dealing with substantive review*

#### 1. *The technical review*

■ Plaintiff challenges the Corps's technical review of the proposals. The evaluation criteria make clear that the three lowest priced proposals first would be evaluated for technical sufficiency; if one or more of these proposals failed the technical evaluation, the NET would review the next lowest priced proposal and would continue reviewing proposals until it found three that were technically acceptable.

Part A of the solicitation addresses the technical review:

Technical acceptability will determined by evaluating the technical features of each proposal on a pass-fail basis against the technical requirements specified in this Request for Proposal (RFP) to include the following evaluation criteria. The Government will exercise reasoned judgment in making its pass-fail determinations. Failure to pass any non-pricing factor contained in the evaluation criteria, except where indicated other wise [sic], will result in a failure of the offeror to be considered technically acceptable and eligible for consideration for award.

Part A then lists three factors under the Technical (Non–Pricing Criteria) heading: Past Performance, Experience, and Management Capability. Two of these factors—Experience and Management Capability—contained subfactors that further defined the information that the Corps expected to receive from the offerors.

Plaintiff first argues that Al Hamra made a material misrepresentation in its proposal regarding the information required to satisfy the experience criterion. Experience, per part A, consisted of two categories: Completed Projects and Like or Similar Work Experience. The solicitation defined what an offeror must submit:

A. **Completed Projects:** A list of not **less** than 5 projects the offeror has successfully completed in the 5 years, *with at least one of the projects having been performed for the U.S. government on a military base in Kuwait....* The list may include projects for which the offeror's firm was performing in the capacity of a prime contractor, in a Joint Venture (JV) arrangement, either as a managing partner or as a junior partner, or as a subcontractor and shall clearly identify the work performed by the offeror's firm in its capacity.... Direct experience of the offeror, any joint [sic] JV partners of companies related by some form of partnership agreement and/or experience of any subcontractors that the offeror proposed to utilize in the execution of this work, will be considered.

B. **Like or Similar Work Experience:** The Offer shall provide a list of at least

---

67 (May 28, 2002); *Industrial Builders, Inc.,* 1999 WL 1267047, 1999 U.S. Comp. Gen. LEXIS 227 (Dec. 29, 1999). Admittedly, the contested CLIN prices submitted by the offerors in these two cases were grossly disproportionate to the government estimates, but the agencies involved nonetheless engaged in the cost or price analysis required under the regulation.

three projects awarded to the Offeror in the last three years for a minimum contract value of $3M (U.S.) for each project. *At least one of these projects must have been performed for the U.S. government on a military base in Kuwait.* All projects listed shall be at least 50% complete at the time of submission in response to this solicitation and shall have significant aspects that are similar in nature to the work included in this solicitation. The list should make evident that such work is/was performed by the offeror....

Although an offeror may use projects on which it was a subcontractor to satisfy the Completed Projects requirements, plaintiff contends that no such allowance is made for the three required projects under Like or Similar Work Experience. Al Hamra listed four projects in its proposal in a chart entitled Like or Similar Work Experience. One of these projects was the [ ]. Plaintiff points to a protest filed with the GAO by Al Hamra on September 6, 2001,[18] in which Al Hamra admits it was a subcontractor on the [ ]. Because Ms. Rudolph, the SSA on the subject contract, was also the contracting officer on the [ ], plaintiff charges her with knowledge of Al Hamra's status as a subcontractor on the [ ]. According to plaintiff, Al Hamra's failure to make its subcontractor status clear renders "[a]ll of the representations by Al Hamra for other Like or Similar Work Experience references ... suspect." Pl.'s Br. filed Mar. 21, 2003, at 40. Plaintiff labels the NET team's decision to pass Al Hamra in the Like or Similar Work Experience category arbitrary and capricious.

Plaintiff has failed to show that Al Hamra made a material misrepresentation. An appropriate showing would be that Al Hamra

misrepresented its status in order to conform to the evaluation criteria and that the Corps relied upon the misrepresentation in awarding the contract. *See CCL,* 48 Fed.Cl. at 121. Explicit language allowing a project on which the offeror worked as a subcontractor to qualify as relevant experience appears in Completed Projects, but not in Like or Similar Work Experience. However, it does not follow automatically that subcontractor status on a project would fail to qualify as acceptable similar work experience. Defendant, in fact, takes the position that the phrase "award to" encompasses projects on which an offeror served as a subcontractor.[19] No evidence has been adduced that Al Hamra misrepresented its status on the [ ].

In any event, Al Hamra submitted three other contracts in addition to the [ ], and these contracts satisfied the requirements for Like or Similar Work Experience. Because Al Hamra satisfied the requirement to list three projects on which it was the prime contractor, it is speculative what role, if any, the fourth played in the NET's compilation of the Like or Similar Work Experience prong of the Experience factor. Thus, the court cannot infer that the NET relied on the allegedly defective submission or that any reliance was material. *See Synetics, Inc. v. United States,* 45 Fed.Cl. 1, 15–16 (1999) (finding no material misrepresentation when plaintiff was unable to show that alleged misrepresentation factored into award of contract to different offeror).[20]

Plaintiff next argues that the NET improperly evaluated Al Hamra's submissions regarding the Management Capability factor. The criteria for this factor, in pertinent part, appear, as follows:

**A. Management and Execution Plans**

---

18. Plaintiff does not provide the name of, or a citation to, this protest.

19. Defendant does admit, however, that the NET should not have considered the [ ] when reviewing Al Hamra's submission under the Like or Similar Work Experience subfactor because the [ ] was not awarded within the past three years, as required by the solicitation. *See* Def.'s Br. filed Apr. 29, 2003, at 13.

20. Plaintiff's argument that *Seattle Services,* 45 Fed.Cl. 560, mandates a result in its favor is misplaced. The court in *Seattle Services* deter-

mined that the contracting officer acted unreasonably by failing to review the incumbent contractor's past performance in one of the facilities covered under the solicitation. *Id.* at 567. The contracting officer was aware of the incumbent's past performance, but failed to take it into consideration. In the case at bar, even if the SSA knew that plaintiff was a subcontractor on the [ ], this knowledge was not material because plaintiff submitted a sufficient number of qualifying contracts to satisfy the solicitation's evaluation criteria.

(1) The Offeror shall provide management and execution plans that should address the following areas: organization, staffing, qualifications, key personnel, management techniques, and rapid response to design, procurement, and construction of facilities. The Offeror's organizational diagrams should demonstrate the lines of authority and supervision, including who will directly manage and control the labor force and all other aspects of the work performed under this contract on a daily basis. *Failure to provide these documents will result in a "fail" determination for this evaluation factor.*

Pointing to Al Hamra's September 6, 2001 bid protest and to *Behbehani,* 2002 WL 31159457, 2002 U.S. Comp. Gen. LEXIS 144, which involved a protest over a contract awarded to plaintiff, plaintiff argues that Al Hamra's discussion of its rapid response to design capabilities is insufficient. This argument is unsuccessful. First, plaintiff ignores the relevant language of the subject solicitation. The solicitation's evaluation criteria state that an offeror "*shall* provide management and execution plans that *should* address the following areas: organization, staffing, qualifications, key personnel, management techniques, and rapid response to design, procurement, and construction of facilities." (Emphasis added.) Thus, offerors were required to submit "management and execution plans," but the content of those plans, including rapid response to design, was discretionary. Nevertheless, Al Hamra did include, in its proposal, three paragraphs covering "design." It was the NET's prerogative to determine if this submission was satisfactory, a determination that the court will not disturb. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) (technical rating decisions are the "minutiae of the procurement process ... which involve discretionary determinations of procurement officials that a court will not second guess").

[11] Plaintiff's final disagreement with the Corps's technical evaluation concerns the lack of narrative justifications in the worksheets used by the NET members in the technical review. Plaintiff notes that none of the three NET members with voting responsibilities provided any justification for the choice to pass or fail Al Hamra [21] for a certain factor; instead, each evaluator simply circled "pass," "fail," or "neutral" (if neutral was an available option) for each factor listed in the worksheets. This fact, according to plaintiff, supports the conclusion that the NET neglected to follow "the fundamental requirement that evaluation judgments be documented in sufficient detail to show that they are reasonable and not arbitrary." Pl.'s Br. filed Mar. 21, 2003, at 47 (emphasis omitted).

Defendant agrees with plaintiff's assessment of what is required of evaluation judgments. However, defendant reminds of the distinction between tradeoff and lowest price technically acceptable ("LPTA") source selection processes, arguing that, as an LPTA procurement, the NET worksheets, even though they contain no narrative explanations, comply with the FAR.

FAR § 15.101–1 explains that an "agency can obtain best value in negotiated acquisitions by using any one of or a combination of source selection approaches." One of these approaches is the "tradeoff process," which is appropriate when it may be in the Government's best interest "to consider award to other than the lowest priced offeror or other than the highest technically rated offeror." FAR § 15.101–1. Another source selection approach is LPTA, which "is appropriate when best value is expected to result from selection of the technically acceptable proposal with the lowest evaluated price." FAR § 5.101–2.

The solicitation at issue is an LPTA source selection. The evaluation criteria state that "[a]ward will be made to the responsible offeror who submits the lowest priced offer, which is also technically acceptable to the Government." This language follows the mandate of the regulation, which directs that LPTA solicitations "shall specify that the award will be made on the basis of the lowest evaluated price of proposals meeting or ex-

---

**21.** The administrative record contains only the review sheets concerning Al Hamra's proposal.

ceeding the acceptability standards for non-cost factors." FAR § 15.101–2(b)(1).

FAR § 15.305 governs "proposal evaluation." The subsection on technical review, FAR § 15.305(a)(3), applies only when "tradeoffs are performed (see 15.101–1)." While a tradeoff source selection necessitates an "assessment of each offeror's ability to accomplish the technical requirements," and "a summary, ... along with appropriate supporting narrative, of each technical proposal using the evaluation factors," no indication is present that these requirements apply to an LPTA source selection. *See* FAR § 15.305(a)(3)(i), (ii).

As long as the technical review conformed to the solicitation's evaluation criteria, plaintiff cannot undermine it. The solicitation is explicit that each of the three technical criteria—Past Performance, Experience, and Management Capability—will be assessed on a pass/fail basis. This court will not impose additional documentary requirements when neither the applicable regulations nor the evaluation criteria require anything more than what the agency performed. *See Bliss,* 33 Fed.Cl. at 143.

### 2. *Ambiguity*

Plaintiff finds ambiguities in the solicitation, resulting in a "misevaluation of [plaintiff's] proposal, [which] caused the agency to arbitrarily and capriciously award the contract" to Al Hamra. Pl.'s Br. filed Mar. 21, 2003, at 50. The first ambiguity, according to plaintiff, was whether price was the fourth factor of the technical evaluation. A review of the structure of part A in Section 00010 reveals that no ambiguity regarding this issue can be leached from the solicitation.

The first heading in part A is denominated General. The next heading is Technical (Non–Pricing Criteria), which is followed by this statement: "The Technical proposal is comprised of three significant factors[:] Past Performance, Experience and Management Capability." The subheading 1. Past Performance (a factor) then appears, and two others sub-headings follow: 2. Experience (a factor) and 3. Management Capability (a factor). The next heading in part A is entitled Pricing Criteria. Under it appears the sub-

heading 4. Price (a factor). The only possible basis for an ambiguity regarding the composition of the technical evaluation is the listing of the number "4" before Price (a factor). While it is clear from context that Price (a factor) is not part of the technical criteria, defendant is correct that any ambiguity based on plaintiff's interpretation would be considered patent, thus placing the burden on plaintiff to request clarification from the contracting officer. *Statistica,* 102 F.3d at 1582; *C.W. Over & Sons, Inc. v. United States,* 54 Fed.Cl. 514, 528 (2002).

Plaintiff also contends that the inclusion of estimated quantities for the CLINs in Attachment 2 resulted in an ambiguity, as some offerors "may have bid the contract thinking that the [Corps] would order line items as required," while others "may have interpreted the solicitation to mean that the pricing would be limited to the number of units listed in Attachment 2." Pl.'s Br. filed Mar. 21, 2003, at 52.

Plaintiff ignores the language of the solicitation. The solicitation states, in the Pricing Criteria section, that the "IDIQ Sample Pricing Schedule will be used only for the purpose of bid evaluation. The quantities used in this schedule are for this sample only, and do not necessarily reflect a 'typical' scope of work for task orders to be issued under this contract." Even though the CLINs in Section 00010 of the solicitation appeared without quantity estimates, the solicitation states that the quantity estimates in Attachment 2 are for evaluation purposes only. However, to the extent that the use of estimated quantities in Attachment 2 presented an ambiguity, it was patent under plaintiff's interpretation, and plaintiff therefore would be charged with seeking clarification from the Corps.

### V. *Requirements for a permanent injunction*

 To gain injunctive relief, plaintiff must establish: 1) that it has achieved actual success on the merits, 2) that it will suffer irreparable injury if injunctive relief were not granted, 3) that the harm to plaintiff outweighs the harm to the Government and third parties if the injunction were not grant-

ed, and 4) that granting the injunction serves the public interest. *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993). No one factor is dispositive in the court's analysis. *Id.*

■ Plaintiff has succeeded on the merits. Plaintiff has established that the Corps violated an applicable procurement regulation by failing to compare the CLIN prices submitted by the offerors with the unit prices in the government estimate.

Plaintiff has also shown that it will suffer irreparable harm if not granted injunctive relief. Defendant scoffs at plaintiff's contention that it will be irreparably harmed if the court declines to grant an injunction, arguing that plaintiff overstated the amount of its lost profits stemming from the award of the contract to Al Hamra. Defendant then points out that "the guaranteed amount of the contract was only $1,000,000 of work (not profit)." Def.'s Br. filed Apr. 10, 2003, at 31 n. 7. Defendant, however, does not deny that the awardee will profit under the contract. A "disappointed contractor suffers irreparable harm because it is deprived of lost profits under the contract at issue." *Ellsworth Assoc., Inc. v. United States,* 45 Fed.Cl. 388, 398 (1999); *see also Essex Electro Eng'rs, Inc. v. United States,* 3 Cl.Ct. 277, 287 (1983), *aff'd,* 757 F.2d 247 (Fed.Cir.1985).

As to the third issue, the court is required to balance the harm to plaintiff vis-à-vis the harm to the Government and third parties. No harm would be visited on Al Hamra, as the award process was flawed.

Plaintiff argues that issuing an injunction would not impose substantial hardship on the Corps. It contends that the "same justification given for the initial override can surely be used to obtain the actual services required" during the period of resolicitation. Pl.'s Br. filed Apr. 22, 2003, at 17. It points to the military's justification for opening the contract only to Kuwaiti firms as evidence that the military has the resources to procure services quickly in times of urgency. Finally, plaintiff suggests in its briefs and most recently during oral argument that the Corps, to ensure that construction will continue uninterrupted, can procure the necessary unit items through a number of sources, including the Job Order Contract ("JOC") at Camp Doha, Kuwait, a sole-source contract, or a letter contract under the CICA.

Defendant admits that the military possesses certain regulatory authority that allows it to procure in a timely fashion. In fact, Col. Smithers, in his memorandum explaining the need to limit competition to Kuwaiti firms, invoked FAR § 6.302–2 (2003), which allows for less than full and open competition when an agency's need for services is unusually compelling. During oral argument defendant posited that the "changed circumstances in Iraq and Kuwait," *i.e.,* the President's formal declaration on May 1, 2003, of the cessation of major combat operations in Iraq, may require the Corps to "go back and prepare again a determination and findings and get new authority for urgent and compelling circumstances" *Trad. & Cont. W.L.L. v. United States,* No. 03–271C, at 50–51 (Fed.Cl. May 1, 2003) ("Tr."). This process "could take a number of months." *Id.* at 51. The end of the major phase of the Iraqi conflict could render the need for the services called for under the instant solicitation less exigent, thereby rendering invocation of FAR § 6.302–2 more difficult to justify. Because this possibility exists, the court cannot presume to advise the military on the most expeditious contract vehicle that could be authorized.

Defendant also flatly denies that the JOC could be used to meet the Corps's needs. Ms. Rudolph avers that under the JOC, "the Government can order minor construction, rehabilitation and maintenance, and repair services, but no task order may exceed $500,000.00. This is simply not adequate for the type of construction envisioned" by the instant solicitation. Rudolph Decl. ¶ 8. In his January 17, 2003 Determination and Findings justifying an override of the GAO stay, Lt. Gen. Robert B. Flowers stated that the military "was prepared to issue the first $4.6 [million] task order against this contract on 15 January 2003 to immediately put in place the minimal facilities and amenities to house [American] forces." Lt. Gen. Flowers also indicated that an additional $8 million in task orders were scheduled for award within 14 days of January 17, 2003. Given the dollar

volume of the task orders, it is apparent that the JOC could not satisfy adequately the military's needs in Kuwait.

Plaintiff cannot direct the court to a vehicle for contracting that could be used to satisfy, during a period of resolicitation, the Corps's needs for the maintenance and construction services covered under the instant solicitation.[22] Thus, the balance of this injunction factor tips in favor of the Government.

The final issue governing injunctive relief—determining that the grant of an injunction serves the public interest—implicates 28 U.S.C. § 1491(b)(3), which provides that, in exercising bid protest jurisdiction, "the court[ ] shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."

Plaintiff argues that the grant of an injunction would serve the public interest by ensuring a process that conforms to applicable procurement regulations and the solicitation's evaluation criteria. Plaintiff also assures that any delay caused by a reprocurement will be minimal. Defendant responds that a permanent injunction will impact negatively the nation's war effort. Ms. Rudolph's declaration makes the assertion for the military.

Plaintiff is correct that the public interest is served by enforcing a procurement process that conforms with regulatory authority and the solicitation's evaluation criteria. *See Essex Electro,* 3 Cl.Ct. at 288. Defendant, moreover, has shown minimal interest in resolving this matter expeditiously, despite its current claim that delay will cripple the military's efficiency in Iraq. When the court met with the parties on February 11, 2003, it was aware of the impending military conflict with Iraq. *See* Transcript of Proceedings, *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* No. 03–271C, at 9 (Fed.Cl. Feb.11, 2003). Consequently, the court offered to resolve this bid protest "as expeditiously as possible," *id.* at 10, so that "any dislocation would be minimized,"

*id.* at 7. In fact, the court stated that briefing could be completed, and a decision could issue, by March 1, 2003, approximately three weeks after the status conference. *See id.* at 10. The court offered this deadline because it "wouldn't want the government to be in a position to argue that concerns of national security were implicated in any substitution [of counsel] further on down the road . . . . So [the court does not] want the government to argue delay when we could have avoided delay by agreeing on an early briefing schedule." *Id.* at 7.

Defendant represented at the status conference that it would agree to a briefing schedule, and the parties, on February 28, 2003, submitted a proposed one-month schedule for filing their dispositive motions. Predictably, defendant filed a notice of new counsel on March 21, 2003, and moved for an extension to file its dispositive motion on March 24, 2003. Defendant requested an extension owing to the assignment of new counsel to the case. The court adopted defendant's unopposed modifications to the scheduling order on March 25, 2003, which added approximately two weeks to the motions practice.

Defendant has waived its right to premise an argument against the grant of injunctive relief on delay. In late February defendant agreed to a briefing schedule that originally terminated in mid-April, 2003, but then moved to extend the schedule until the beginning of May. The original procurement process, *i.e.,* the date of the request for proposals to the date of the award of the contract to Al Hamra, took only two weeks. Indeed, Col. Smithers recorded the genesis of this solicitation in his November 22, 2002 memorandum, signifying that the period of inception to contract award took only one month.

Defendant's national security argument is of paramount import. *See SDS Int'l, Inc. v. United States,* 55 Fed.Cl. 363, 365–66 (2003). Ms. Rudolph claims that "a permanent injunction could impact the ability of the nation to respond to the imminent wartime needs of

---

**22.** Plaintiff was unable to substantiate at oral argument its claim that a sole-source contract or a letter contract would satisfy the Corps's needs during even an accelerated reprocurement period.

our troops.... An injunction could prevent necessary construction from taking place in support of our soldiers, which, in turn, could result in danger to their health, life, and safety." [23] Rudolph Decl. ¶ 7. Lt. Gen. Flowers, in his January 17, 2003 determination to override the GAO's stay, hinged his determination on matters of national security, stating that "[t]he slightest delay in this contract award and execution will have a direct and tangible impact on [the military's] ability to receive and prepare these soldiers for combat." Col. Smithers voiced these sentiments in his November 22, 2002 memorandum regarding the need for limited competition. He opined at that time that "any delay in contract award is likely to result in an inability to meet the operational deadlines and in serious injury to Government military operations, as well as to endanger the health, safety, security and combat readiness of soldiers in the field."

Defendant at argument was unable to answer the court's queries regarding the specific impact of a 30–day delay on national security issues. *See* Tr. at 49–50. However, plaintiff was also unable to provide an explanation as to how such a delay would not impact national security, stating instead that it "assumed" that a resolicitation could occur "expeditiously and effectively, without any disruption to the services" required by the Corps. *Id.* at 23. In light of the parties' inability to provide the court with specific information regarding the impact of delay, the court must defer to the claim that national security concerns counsel against a grant of injunctive relief.

Thus, the court finds that the grant of a permanent injunction would not be in the public interest. When considered in light of the asserted possibility that a reprocurement would disrupt the Corps's ability to provide the facilities covered by the instant contract, the court must deny plaintiff's motion for a permanent injunction.

**CONCLUSION**

The court concludes that the Corps did not evaluate the offerors' CLIN prices as required by FAR § 15.404–1. Plaintiff would succeed in its quest for a permanent injunction were this country not engaged currently in hostilities in Iraq. However, the court finds that concerns of national security supersede plaintiff's entitlement to injunctive relief.

Accordingly, based on the foregoing,

1. Defendant's motion to supplement the administrative record with the declaration of Marsha F. Rudolph is granted in part and denied in part consistent with the foregoing.

2. Defendant's cross-motion for judgment on the administrative record is granted, and the Clerk of the Court shall enter judgment for defendant.

3. Plaintiff's motion for judgment on the administrative record is denied.

4. By May 20, 2003, the parties shall identify any protected/privileged material subject to deletion.

**IT IS SO ORDERED.**

No costs.

---

**23.** In deviation from normal practice, defendant did not file a declaration from a military official to support its invocation of national security concerns. This will be the first time that a national security issue was raised without a declaration by a cognizant official. When evaluating defendant's national security argument, the court indulges the assumption, shared with the parties during oral argument, that "our military is fighting a war, and doesn't have time to execute declarations." Tr. at 46.